This is the time for hearing in United States v. Perez Garcia and Fentzel, which have been consolidated for purposes of this argument. Ms. Hurlbrink, you may proceed. Yes, good morning, your honors. Katie Hurlbrink on behalf of Mr. Perez Garcia and Mr. Fentzel. Under Heller and Bruin, the government can validate a gun restriction only by pointing to a historical tradition of regulation present at the founding. Here, the government has not identified a tradition that would justify disarming all OABCs or one that applies in my client's particular circumstances. Thus, this court must reverse. I'd like to begin today by just noting a couple of areas that this appeal does not affect. First of all, under the BRA, everyone released must, as a release condition, abide by all laws. And by law, many people already can't bear arms. That includes domestic violence misdemeanors, people with felony convictions, the undocumented, and the mentally ill. So this condition really only affects people like my clients, people who could otherwise lawfully bear arms. Additionally, we are not arguing that this condition would never be appropriate under any circumstances. But here, the district courts did not find that my clients had behaved threateningly or violently in any way with or without firearms. And that takes them outside of the scope of many of the government's proper historical comparators. So with those clarifications, I'll move to discussing the government's proposed comparators one by one. Counsel, if I may, you just said that there's no finding that your clients have acted dangerously or will act dangerously with guns. But I thought there were hearings in both cases where the district court or the magistrate judge did make such a finding. Yes, Your Honor. That is what the district courts said. But on review in this court, this court reviews the district court's factual findings for clear error. But it reviews de novo, the conclusions drawn from those findings. And the factual findings themselves do not show any violent behavior, any threatening behavior. And in particular, this court's job on de novo review under Bruin is to determine whether these factual findings support the kind of threat or the kind of danger that would bring my clients into the ambit or the scope of a deeply rooted historical tradition of regulation that allows for disarmament. Ms. Hurlbrink, let me ask this. We restrict or deprive pretrial detainees of a host of constitutional rights, the right to speak or to assemble, to associate, to travel freely, to be searched. Why does it seem that your arguments want to elevate the Second Amendment right to a unique constitutional analysis rather than these other ones? No, Your Honor. We recognize that the Second Amendment is not unlimited. But in determining the limits of the Second Amendment, Bruin tells us we have to look to text and history. And that is how this court treats other infringements on releasees' liberties. It is when the government wants to infringe on a releasee's liberties, the government has to justify that infringement under an applicable constitutional standard. So, for instance, in United States v. Scott, the government claims the authority to conduct searches of a pretrial releasee because of that releasee's status. And how this court responded is this court applied Fourth Amendment standards, applied the special needs test, applied the totality of the circumstances. And under those tests, it determined that the releasee's Fourth Amendment rights had been violated. So that's what we're asking Your Honor to do here, to apply the applicable constitutional standards and find that they have not been met. And I take it you're not of the view that under Salerno, because the Supreme Court has determined that for detention, the governmental interest in protecting the community can overcome individual interests, that that wouldn't apply in this context as well. That's correct, Your Honor. The main holding of Gruen is that means-ends balancing cannot be applied to the Second Amendment, and Salerno is rooted entirely in means-ends balancing. Additionally, Salerno only addressed facial Fifth and Eighth Amendment challenges to the BRA's detention provisions. And it was issued decades before Heller even recognized that there was an individual right to bear arms. So it certainly cannot be read to shut down an as-applied Second Amendment argument of the kind we're making here. Go ahead. Why is the Second Amendment to be treated differently? I understand certainly Gruen, but it's a standalone. We have here in the context of a pretrial release, lots of other amendments that arguably apply, and the analysis there doesn't depend upon finding historical analogies. Why do we abandon the route we've used in analyzing pretrial release under other constitutional liberties for the sake of historical analysis, when historical analysis has not been a factor with regard to liberty itself? Sure, Your Honor. Well, Gruen tells us that for a firearms regulation, the standard, the only standard that applies is a standard based on text and history. Heller says that it is adopting a generally applicable standard for the Second Amendment. And it's true that means-ends balancing applies in many other constitutional contexts, but so does historical analysis. And that's what Gruen draws parallels to, for example, some of the ways we think about the First Amendment. But regardless, Gruen squarely holds the text and history in this context are the only way to validate a gun restriction. Well, Counsel Gruen talks about gun regulations. Is this condition for release really a gun regulation? It seems to me that it's something entirely different, that it's something that allows, it's the least restrictive conditions, or it should be the least restrictive conditions that would allow someone who's been indicted based on probable cause to not be, to have the freedom of not being detained. And if they were detained, you know, all of these rights go out the window. So this is the least restrictive measure individualized to allow this person to have their freedom until they have their trial. Your Honor, I'd like to address a couple of points in Your Honor's question. So, first of all, Your Honor is asking whether this is a gun restriction. And it certainly is. It is, in fact, a complete prohibition on my clients exercising any kind of Second Amendment rights. It's not a regulation. It's not an enactment by a governmental entity that restricts guns for your normal law-abiding citizens. It's something that's an individualized condition to give the indicted person some measure of freedom. And if the choice is having that measure of freedom versus being detained, I would think that your client would prefer to have the measure of freedom with some conditions on it. Yes, Your Honor. So, again, I'll answer a couple components of Your Honor's question. In terms of it being a regulation, one way to think about this is that it is an as-applied challenge to the provision of the VRA that allows this condition to be set. Not a facial challenge, but an as-applied challenge. I am taking, just to be clear, this is an as-applied challenge, correct? Yes, Your Honor. Okay. I just want to make sure that that's clear, because we can get into the individualized circumstances of your clients. Yes, Your Honor. And in terms of Your Honor's question about detention, So, Scott says that the unconstitutional conditions doctrine applies in this sphere. And the unconstitutional conditions doctrine limits the government's ability to condition benefits on insisting upon unconstitutional conditions. So, I think in that circumstance, if a client was asked to choose between their liberty, between the benefit of getting released, and acceding to an unconstitutional condition, they would have a claim under that doctrine. But also, as a practical matter, Your Honor, it should be a rare case where someone is not a prohibited possessor. They don't fall under the ambit of any of the government's historical regulations. They are non-threatening enough to be considered for release, but the magistrate judge can't fashion any conditions that would protect the community. Magistrate judges have many tools in their toolbox, apart from complete disarmament. I'm sorry to interrupt, but why would it be a rare case if the specific class we're dealing with are pre-trial felony indicted detainees and releasees? To get back to Judge Wardlaw's question, this is not a rule of general applicability throughout the entire community. It's tailored towards individuals who are awaiting trial on felony charges and whether they can be released subject to conditions that would make it safe for them to do so and to appear in court. That differs, doesn't it, from the types of gun regulations that the courts see on a regular basis, such as the New York law or others. There's a uniqueness to this that's more about what conditions can be placed before someone can return to trial versus a broad-based, to all law-abiding citizens, these are the regulations that will allow you to own or possess a gun. I recognize the distinction Your Honor is drawing, but a couple of points on that. One, my clients fall squarely within the plain language of the Second Amendment, and as such, they presumptively have the right to bear arms, just like someone who has not been indicted. Furthermore, it would be antithetical to the presumption of innocence to assume that they were not law-abiding just because they had been charged with a crime. And as we've laid out extensively in our briefing, Bruin's law-abiding language cannot be read to resolve questions about the non-law-abiding. But that applies to other constitutional rights as well. That presumption of innocence still holds for the right to assemble, the right to travel. And yet these indicted individuals aren't allowed to just travel freely to another state, even though they have a presumption of innocence, or to assemble with certain individuals if it poses a danger. So help me understand what's the distinction. The presumption of innocence applies to a host of these constitutional rights, and yet these restrictions have been lawfully imposed on a temporary basis in other circumstances. Yes, Your Honor, and I see I'm getting low on time, but I'll answer Your Honor's question. So yes, that's true, but pretrial releasees are, one, not considered to have the same rights as someone who has actually been found guilty of a crime. Their rights are different and greater. And second, when this court has allowed for releasees' rights to be infringed, they've done so only after applying the applicable constitutional standards to pretrial releasees. And if the government could show a historical tradition that all releasees are disarmed, something that would allow for release itself, per se, to validate a gun restriction, then that standard, that Second Amendment standard, would be satisfied as to all releasees, but the government hasn't done that. And with that, I'll reserve the remainder of my time. All right, thank you very much. Mr. Howe? Thank you, Your Honor. May it please the Court, Zach Howe on behalf of the United States. The Second Amendment is not a lesser amendment, and it does afford real protections. However, it does not require a court to allow someone under felony indictment to possess guns when doing so would endanger the community. I think concluding otherwise would require this court to give special treatment to gun conditions that doesn't apply to any other condition of pretrial release. Neither precedent nor history require the court to do so. And it's fortunate that precedent and history don't require the court to do so, because if it did, that would mean that courts would have to either detain defendants to protect the community when a gun condition would have done the trick, or they would have to allow defendants to be released on bail even when doing so would endanger the community. So let me begin with precedent. We cite a host of Supreme Court cases affirming numerous restrictions on those under felony indictment. One of them is Salerno, which affirmed detention based on danger to the community. And as cases like Scott from this court show, that same framework has been applied to bail conditions. So under that precedent, the condition here is valid because it requires an individualized finding that a gun condition is the least restrictive way to assure the appearance in court and, quote, the safety of any other person or the community. Counsel's brief argues that Salerno does not apply because that's a detention case. And here we're talking about conditions of release. How would you respond to that point? Thank you. I think the response is that so, for example, this court Scott case applied the very same framework from Salerno to the bail context. And there it was dealing with a Nevada bail law. And the very reason for striking down that Nevada bail law was because it didn't have a standard like the one in the bail reform act. And the court suggested that if it did require an individualized finding about danger to the community, then that Nevada bail law would have been valid. And so it distinguished the bail reform act. The problem for Fensel and Perez is that here we are dealing with that very bail reform act that requires those very individualized findings that the court and Scott said would have sufficed to uphold the constitutionality of bail conditions. So that framework in Salerno applies equally to the bail context under this court's precedent. So what do we do with the evidence in this case? And I understand this is as applied challenge, but there's evidence that the Southern District routinely included the gun restriction, regardless of the nature and circumstances of the crime. Your honor. So what I can say is I think this is being used as sort of an atmospheric point. I haven't actually seen any argument or explanation or citation to authority for how that would actually relate to their constitutional arguments here. And I think there's a good reason for that. It's because there's not really a credible theory for how that would map onto their arguments here. If their complaint is that courts in the Southern District of California are improperly applying a presumption that that gun condition should apply, then that's not a second amendment argument. That's an argument that the statute is being violated, but they're not saying the statute is being violated here. They're raising a second amendment argument. So this presumption about what other courts are doing can't possibly relate to their constitutional argument. And in any event, they would obviously have no standing to challenge what's happening in those other courts. Would the government have any objection to say an opinion that something like an individualized standard must be employed for this to be a legitimate condition of release? I'm sorry, I don't think I heard the entirety of what you said, your honor. What I'm saying is, does the government agree that this condition must be based on an individualized assessment and individualized findings of fact as to what's the least restrictive means of ensuring public safety and the release's return to the court? I do agree with that, your honor. I think there can be some debate about what actually constitutes an individualized finding. So to give an example, what often happens, at least I haven't spent lots of time in magistrate court in a few years, but my understanding is what typically happens is in any case where the government is moving for detention, there is going to be a full-blown detention hearing. And there you're obviously analyzing whether any condition can ensure safety to the community or appearance in court. And so I think you can argue that when all of these factors have been aired and then the court says, yes, some amount of conditions can be fashioned and imposes a gun condition, it's sort of implicitly made an individualized finding that that condition was necessary. So I think there can be some debate about what constitutes the individualized finding. But I certainly agree that under the statute, there is a requirement of an individualized finding. That raises a concern, and I think it's the one that Judge Wardlaw started with, which is we have here a standard condition. So you don't necessarily have that full-blown detention hearing and individualized treatment that you've seen to have based your defense of this term in the context of these two cases. This is an as-applied challenge, but the context matters. And if the context is, okay, it's on the standard checklist, it's going to be there unless somebody objects. I suspect there are a lot of cases where you don't have the individualized findings that you're relying upon, which really brings us back to the question that Judge Wardlaw posed. How would you respond to an opinion that accepts your argument and says there must be such an individualized finding and suggests that including it in a standard form list of conditions doesn't satisfy that requirement? Sure. So I would say if you're going to include language along those lines, then that language should be directed at how to properly apply the statute. That would have nothing to do with violating the Second Amendment. Now, in these particular two cases, which is, I think, what the court would be addressing, we do have individualized finding. It's Exhibit A of both of the cases here. In both cases, you have individualized findings from both judges on this condition actually being necessary. Again, I would urge the court, if the court is going to include language on this, to address what an actual individualized finding is. Because I think if a district court or a magistrate judge has already addressed the sort of broader question of whether any condition can assure safety to the community and comes down by concluding that, yes, there are conditions, and these are the ones, and it includes the gun condition. Then I think that arguably includes an individualized finding about the gun condition. So I certainly don't have any opposition to the court saying that, yes, the statute means what it means. It's an individualized finding. But I do think it should take some care and explain what that would be. But again, I think this is all completely aside from any argument that they're actually raising here, which is why the court perhaps doesn't even need to go there, because they are only raising a Second Amendment argument. They're not raising an argument about the statute being violated. So I think they've waived any argument to that effect. Again, this whole thing about other courts applying presumptions and all of that is really just being used as an atmospheric point, but it doesn't actually tie into their Second Amendment argument. Mr. Howe, how would you respond to the point that Ms. Hurlbrink said that courts do analyze some of these conditions under the various rubrics? If it's a Fourth Amendment search and seizure issue, then the courts will analyze it under that law. And here defendants are asking us to do the same through the Second Amendment lens and trying to find a historical tradition to map onto what this condition asks for. What's wrong with that argument? Well, so I don't know that in the Fourth Amendment context or any other context, they've been looking for historical analogs or anything like that. I've never seen a case like that. Scott doesn't engage in that sort of analysis. It simply says that if you had applied the standard in the Bail Reform Act instead of the standard in the Nevada Bail Law, then these conditions could have been valid. So to the extent that all Ms. Hurlbrink is asking is that the Bail Reform Act be applied, I certainly agree with that, but there's no constitutional violation baked in there. It's just a request to do what's being done in every other case, apply the Bail Reform Act. Counsel, that's really her argument is there's a right, Second Amendment right, and the Supreme Court has now told us we analyze restrictions on that right, only looking to text and history. So we've got the text down. So what historical analog would you have us look at? Sure. So I have you look at, there are several we cite, and I do want to clarify the actual Bruin standard. You're looking at the how and the why of why a historical law was passed and comparing that to the current law. Here we cite historical practices of detention. The how is detention. That's a greater restriction because you're taking away all liberty, including the gun rights. And the why was certainly flight, but there was certainly an element of danger to the community. We cite the dangerous defendants article from the Yale Law Journal. And if you look at note 46 of that law review article, the professor cites a number of articles, including a treatise on bail dating back to 1783, suggesting that detention always had an element of danger to the community baked in. So you've got a how that is more restrictive than the law here. And you've got a why that maps on nicely to what the law is doing here. And then we also say that bundle of laws that have been referred to as orderly society laws. It includes, you know, variety of laws, some of which, you know, would be flagrantly unconstitutional today on other grounds. But they broadly speaking, barred guns to groups of individuals that were deemed dangerous by legislatures and dangerous, you know, meant rebellious, disloyal, violent, or simply law breaking. And those laws, again, the how is barring guns, barring guns permanently. And the why is danger and perhaps more. That maps on nicely to what's being done here. Here it's not even a permanent ban on guns. It's a temporary ban on guns only while you're on felony indictment. And if there's a danger to the community. So that's why danger. So I think those map on nicely as well. And then we cite surety laws and we cite some other factors that are discussed in Bruin too. But suffice to say, I think there's ample historical precedent for upholding the laws here that would map on to Bruin's framework. Now, I can't address, you know, to the extent that the argument is that those orderly society laws, you know, may have upheld barring guns to, you know, individuals who pose some danger or something like that. But that the standard in the Bail Reform Act is actually broader and therefore would be unconstitutional on that ground. I just don't think that's right. If you look at all the cases that have interpreted these historical laws, there's some disagreement in exactly how broad they think those laws sweep. But all of the judges who have interpreted these laws agree that they support barring guns for those who present a danger to society. If you look at the Fuller Tower case from Third Circuit, the Medina case from the D.C. Circuit, they say that these laws can be interpreted as allowing legislatures to bar guns to those who are dangerous and even individuals who are nonviolent in certain circumstances. If you look at the position of the judges who disagree and take a slightly narrower view, such as then Judge Barrett and the Cantor B. Barr dissent that she had, even she still says those laws allow you to take guns away from people who are danger, present a danger to the community. So regardless of the exact nature of how broad these laws sweep, everyone agrees they let you take away guns from those who are dangerous to society. And that is exactly what the Bail Reform Act requires here. So I think those historians, if you were to get to this step, if you were to say, you know, we're going to brush aside Salerno, we're going to brush aside Scott, and we're going to apply Bruin, even though it had absolutely nothing to say about bail, about detention, about the constitutional rights that are necessarily restricted when you were dealing with the bail and detention context. Even if we brush all of that aside and get to the Bruin framework, then I think there are ample historical sources that would support this law here. So I'm happy to answer additional questions. Otherwise, I would ask the court to adjourn. Thank you, counsel. Thank you. Ms. Holbrook? Yes, Your Honor. So I want to start by discussing the government's claims about United States v. Scott. United States v. Scott did not say that if the Novada condition had been imposed under the VRA-style conditions, it would have been appropriate. But what it was doing was performing a totality-of-the-circumstances test in the course of applying the Fourth Amendment. And it cited Salerno as an illustration of a way that the government might show in an interest-balancing inquiry that it actually had an interest in preventing danger. And that kind of interest-balancing inquiry just can't be done here. So it just doesn't stand for what the government says that it does. As for the government's historical analogs, the orderly society laws that the government was discussing at the end, the Third Circuit in range attempted to rely on that very theory. And that opinion was almost immediately vacated within days of the en banc hearing petition because the methodology is so far from Bruin. It's far too generalized and does not stick closely to the historical record. And our federal defender's brief has done a good job of explaining why that violence is Bruin. I have other points I could make about the other comparators, but I see I'm out of time. So unless your honors have further questions. Does anyone have any questions? Okay, well, thank you, counsel. The U.S. v. Perez-Garcia and Fensal will be submitted. And this session of the court is adjourned for today. Thank you. This court for this session stands adjourned.
judges: WARDLAW, CLIFTON, SANCHEZ